**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BERNADETTE WILLIAMS, RICK MCCONNELL, IVAN SERRATA REYES, ROSILYN WILSON, LINDA LEWIS, LATASHA HUFF, HAUNANIMAE CERVANTES-WHITE, MARIA MUNOZ, TRACY OBRIEN, KIMBERLY BENSON, ROY TUINSTRA, EVELYN BROWN, MICHELLE SNYDER, PATRICIA COUCH, SABRINA CAPERS, WILLIAM ROSS DEAN, RICHARD DACHEFF, KRISTY KELLER, JASIMEN HERNANDEZ, EDGAR FLORIAN, MICHAEL GROSSBERG, MERRILL LOVE, DIANE NEWKIRK, SANDRA SMILING, DAVEY JOHNSTON, CYNTHIA ROEMER, SHAUN ROBERT, ROQUE ESPINOZA, JENNIFER PAYNE, LATISHIA BOWDEN, and DJ NEILL, TYSON DEWSNUP, DEIRDRE PALMER, on behalf of themselves and all others similarly situated, | Case No.: 1:22-cv-01422  Judge Virginia M. Kendall |
| Plaintiffs, | |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., | |
| Defendant. | |

## JOINT MOTION FOR ENTRY OF ESI PROTOCOL

1

Pursuant to the Court's Text Orders (ECF Nos. 125 and 138), Plaintiffs and Defendant State Farm Mutual Automobile Insurance Co. jointly move the Court for entry of an ESI Protocol.

Plaintiffs and Defendant have had extensive meet-and-confer discussions regarding the terms of an ESI Protocol and have substantially narrowed the issues of disagreement. Accordingly, the parties jointly submit Plaintiffs' proposed ESI Protocol (**Exhibit A**), Defendant's proposed ESI Protocol (**Exhibit B**), and redline comparison of the parties' proposals (**Exhibit C**). The following are the Parties' respective positions on each issue in dispute:

## 1. Discrete Document Collections (Ex. A, Section II, ¶ 3)

- **<u>Plaintiffs' position:</u>**

Paragraph 3 of Plaintiffs' ESI Protocol ensures that the Parties produce readily-identifiable (or known) responsive information, regardless of whether the Parties also use search terms to identify and collect responsive documents. This provision is also well accepted and entered in ESI Protocols entered by federal courts in this District and across the country. *See, e.g.*, *Brown v. Coty, Inc.*, 1:22-cv-02696 (S.D.N.Y. Aug. 26, 2022), ECF No. 46, at 3; *In Re: Phillips Recalled CPAP, Bi-Level Pap, and Mechanical Ventilator Products Litigation,* (W.D.P.A. Jul. 21, 2020) ECF No. 660, at 4; *In Re: American Medical Collection Agency, Inc., Customer Data Security Breach*, (D.N.J May. 15, 2020) ECF No. 197 at 30; *Bledsoe v. FCA US*

*LLC*, (E.D.M.I. Oct. 29, 2019) ECF No. 113 at 2; *In Re: Samsung Customer Data Security Breach Litigation* (D.N.J. Jun. 27, 2023) ECF No. 66 at 3.

While search terms can be useful to cull large volumes of ESI (with appropriate validation), such tools do not relieve the Parties of their fundamental obligation to produce responsive information that is already known. If a Party knows that responsive documents exist, it must produce those documents regardless of whether they are "hit" by search terms. *Cohen v. Apple Inc*., C 19-05322 WHA, 2020 WL 13582130, at *2 (N.D. Cal. Aug. 3, 2020) ("[S]ettling on a search methodology does not relieve a party of its obligations under the Federal Rules to conduct a reasonable search and produce all relevant and responsive documents and ESI of which it is aware.").

Likewise, if discrete collections of responsive information (e.g., a physical or electronic folder of policy decisions or total loss studies), those files should be collected and reviewed without the application of search terms to "cull" the contents. Defendant's attempt to limit its discovery obligations to only reviewing documents that "hit" on search terms rather than produce known relevant discovery as Plaintiffs' Protocol proposes contravenes its discovery obligations. *See Albert v. Lab. Corp. of Am.*, 536 F. Supp. 3d 798, 801 (W.D. Wash. 2020) ("[W]hat should be common practice is to collect and produce electronically stored evidence that is known to a party to be responsive to a discovery request or relevant to the subject matter of the

action whether it was identified as responsive by the search protocols the parties adopted").

Defendant has struck Paragraph 3 (Document Collections/Custodian Identified Files) of Plaintiffs' Protocol altogether, which would give Defendant broad discretion to apply search terms across readily identifiable (or known) responsive collections. This means that, if a document does not hit on a term, Defendant need not produce it—even if Defendant is already aware of the existence of such responsive document.

Plaintiffs' only recourse would be to continue a game of "Go Fish" by submitting endless iterations of additional search terms to identify documents Defendant already knows exist or likely exists. Such an approach is not only less precise and more burdensome on all Parties than simply producing all known, responsive documents; it also fails to address the underlying substantive concern: that Defendant has identified responsive documents that it could refuse to make available to Plaintiffs.

- **Defendant's position:**

The parties have spent months negotiating an ESI Protocol in good faith that in Defendant's view is far more detailed, extensive, and technical than this case warrants. It is also far more detailed, extensive, and technical than this Court's sample ESI order, available here, which Plaintiffs also refused to use. This case is

4

one of several total loss putative class actions pending around the country, and in no other case has the production of ESI been an issue, so much so that the lawyers litigating those cases recognized that no need for an ESI protocol even existed. That's because these total loss class actions are not document-intensive cases, let alone ESI-heavy ones. Still, given Plaintiffs' insistence here, Defendant agreed to negotiate an ESI Protocol in good faith, but at every turn Plaintiffs have insisted on onerous, burdensome, and overly technical provisions that better belong in massive antitrust MDLs, but here will only needlessly complicate discovery and generate disputes, as here—precisely the opposite of what an ESI Protocol is intended to accomplish. *See* Fed. R. Civ. P. 1.

As one example, Plaintiffs have insisted on including a section referencing "Discrete Document Collections / Custodian Identified Files" in their ESI Protocol, which is unnecessary and doesn't belong in an ESI Protocol at all and is simply an attempt to micromanage every aspect of Defendant's document collection and review process. If, through custodial interviews and other fact gathering, there are discrete document collections that are responsive, those document collections will be collected, reviewed, and produced, just as they would be in any case without an ESI Protocol in place, as the rules require. In fact, Defendant has already identified and produced discrete document collections, such as claim files, insurance policies, applicable contracts, standard claim processes, and training materials, without the

need for such a provision or an ESI Protocol at all. There is simply no need for such a provision, especially where, as here, the Parties are in agreement that known responsive ESI must be produced absent any search methodology. (*See* Ex. B, Section II.2.)

### 2. Hit Reports and Validation (Ex. A, Section II, ¶¶ 5-6; Ex. B, Section II ¶ 4)

- **Plaintiffs' position:**

Plaintiffs' ESI Protocol aims to ensure that the search tools used by Defendant are calibrated to effectively identify responsive documents and that Plaintiffs are provided the information necessary to assess the effectiveness of search terms to ensure they are neither too narrow nor too broad. The fundamental question when a Defendant uses computerized search tools to identify responsive documents is whether those tools identify a sufficient percentage of responsive documents to meet its discovery obligations. Search methodologies, particularly search terms,[1] can be both significantly over- and underinclusive, which is why it is essential for Defendant to cooperate and be transparent in the search methods employed and properly validate them. *See e.g.*, *Deal Genius v O2COOL*, 2023 WL 4556759, *5

---

[1] TAR is far more accurate and cost effective than search terms, *e.g.*, *Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012) (average recall rate of keyword searches only 20%), but it should not be used in combination with search terms. If TAR is performed after culling with search terms, the average recall rate would be just 16%.

(N.D. Ill. 2023) ("parties should adopt iterative search term development procedures and quality assurance practices that can help identify relevant information not retrieved by the original search terms"); *William A. Gross Const. Assocs. v. Am. Mfrs. Mut. Ins.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("wake-up call" to the Bar that "where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords … and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of 'false positives'"). Plaintiffs' ESI Protocol ensures that the Parties will discuss quality control methods to evaluate the sufficiency of Defendant's search methodologies and results.

Plaintiffs do not seek perfection in Defendant's searches. But experience has shown that, if search terms are used without proper testing and validation, they will *miss* 75-80% of relevant materials. *Moore*, 287 F.R.D. at 191 (Keyword search protocols are flawed and have an average recall rate of only 20%); Grossman & Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 11, 21, 26 (2011) (keyword search resulted in an average recall of "only 20.0%").

It is critical that the parties work cooperatively to test and sample the data to increase the relative proportion of relevant and responsive documents within the search results and production sets. This is called "recall," and it is the most important

metric in the search and review process—permitting Defendant to reliably evaluate the effectiveness of search terms. Plaintiffs cannot not be forced to negotiate blind, guess which terms to omit/add, whether to narrow connectors, and whether a term omits a high percentage of responsive ESI. The case law—in this District and elsewhere—overwhelmingly supports cooperation in developing search and validation methods because it "is entirely consistent with both the letter and spirit of the [FRCP]." *Pyle v. Selective Ins*., 2016 WL 5661749 (W.D. Pa. 2016); *see City of Rockford v. Mallinckrodt ARD Inc*., No. 17 CV 50107, 2018 WL 3766673, at *4 (N.D. Ill. Aug. 7, 2018) (the court compelled the defendant to conduct random sampling to validate the process and provide reasonable assurance that the production is complete); *Lithium Ion Batteries*, 2015 U.S. Dist. LEXIS 22915, *56 (N.D. Cal. 2015) (including provision requiring qualitative sampling).

Hit reports must include sufficient information to allow the parties to meaningfully evaluate proposed search terms. Defendant's approach leaves Plaintiffs without an effective tool to assess the accuracy of search terms, and affirmatively broadens the existing information gap between the parties. The purpose of generating hit reports is to enable the parties to productively negotiate and modify search terms, by enabling the parties to understand the effectiveness of proposed terms and their limitations. Moreover, the tools used to generate hit reports can readily produce this additional information with no burden to Defendant. Numerous courts have entered

ESI Protocols required detailed hit reports. *See, e.g., In Re: Hair Relaxer Marketing Sales Practices and Products Liability Litigation*, (N.D.ILL. May. 18, 2023) ECF 109 at 2; *Brown v. Coty, Inc.*, 1:22-cv-02696 (S.D.N.Y. Aug. 26, 2022), ECF No. 46, at 3; *In Re: American Medical Collection Agency, Inc., Customer Data Security Breach*, (D.N.J May. 15, 2020) ECF No. 197 at 30; *Bledsoe v. FCA US LLC*, (E.D.M.I. Oct. 29, 2019) ECF No. 113 at 2; *In Re: Samsung Customer Data Security Breach Litigation* (D.N.J. Jun. 27, 2023) ECF No. 66 at 3.

Hit reports alone, however, are insufficient. Courts require cooperative quality assurance sampling and validation of nonresponsive sets and of the entire collection against which search terms were run. *See*, *e.g., City of Rockford v. Mallinckrodt ARD Inc.*, 2018 WL 3766673, at *4; *In re Lithium Ion Batteries Antitrust Litig.*, 2015 WL 833681, at *3; *William A. Gross Constr. Assocs. v. Am. Mfrs. Jut. Ins. Co.*, 256 F.R.D. at 136.

- **Defendant's position:**

Defendant's proposed hit report provision provides Plaintiffs the precise information they need: "the number of documents with hits for that term, and the number of family members if any associated with that document, to determine whether there is an appropriate level of recall (the percentage of responsive documents in the collection against which the search terms were run which include a search term)." Following that process, Defendant's proposed hit report provision

contemplates that "[t]he Parties will meet and confer to resolve disagreements over the search terms or their application." (*See* Ex. B, Section II ¶ 4.) Plaintiffs' position statement suggests otherwise, but Defendant recognizes that crafting appropriate search terms will be an iterative and collaborative process, and Defendant's proposal ensures the integrity of that process in a realistic, cost-effective manner.

In contrast, Plaintiffs' proposed ESI Protocol includes onerous and burdensome hit report and validation procedures (*see* Ex. A, Section II ¶¶ 5-6), including representative sampling of non-responsive documents, that are not only unnecessary, but to which Plaintiffs themselves have refused to agree. *See infra* § 3, Defendant's Position. There is no need for such provisions. This is not a document-intensive case, let alone an ESI-heavy one. Yet Plaintiffs want to treat this case as though it were a massive antitrust MDL. It is telling that the cases they cite in support of so-called "elusion testing" are cases that "involve millions of documents." *City of Rockford v. Mallinckrodt ARD Inc.*, 326 F.R.D. 489, 491 (N.D. Ill. 2018); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420 YGR (DMR), 2015 WL 833681, at *1 (N.D. Cal. Feb. 24, 2015). But here, there will be thousands of documents—not millions. There is no justification to insist on validation procedures that will only increase costs and burden with no conceivable benefit. *See* Fed. R. Civ. P. 1.

### 3. Applicability of Validation Procedures to Both Parties (Ex. A, Section II ¶ 6; Ex. B, Section II ¶ 4)

- **<u>Plaintiffs' position:</u>**

What is good for the goose is not always good for the gander. Defendant has no good faith reason to insist upon the same validation procedures applying to Plaintiffs. Unlike Defendant, Plaintiffs are not multi-national corporations with offices across the globe with thousands of employees producing millions of pages of ESI every day. Plaintiffs are individuals who purchased insurance policies with Defendant and suffered a total loss. They have simple data storage structures. They also do not possess the quantity of relevant discovery as Defendant. Put simply, the scope and scale of discovery is different. Plaintiffs often do not need to use search terms to identify responsive information (such as a known email received from State Farm). And when they do, the search terms are not complicated search strings like Defendant will use. Plaintiffs would use single terms or other simple searches to identify responsive information. Plaintiffs also have heightened privacy concerns that Defendant does not. The documents collected by Defendant relate to business matters, while Plaintiffs are all personal in nature.

The same validation is simply not feasible for Plaintiffs, and that should not be used as a reason for Defendant to avoid using qualitative sampling of documents. If Defendant will agree to use single term search queries, rather than strings tied together with numerous limiters, like Plaintiffs would use, then the parties can talk symmetry. But the parties do not wear identical shoes and discovery is not

symmetrical—and thus Defendant here is using "reciprocity discovery obligations" as a means to obtain unfair advantage. Recognizing these differences, numerous court have entered Defendant-only validation provisions. *See, e.g., City of Rockford v. Mallinckrodt ARD Inc.*, 2018 WL 3766673, at *4.

- **Defendant's position:**

Plaintiffs' proposed ESI Protocol includes onerous search validation procedures (*see* Ex. A, Section II ¶¶ 5-6) that purport to apply only to "Defendant," rather than both parties. As explained above, Defendant's proposed ESI Protocol includes a much simpler and more effective hit report procedure that applies to both parties. But regardless how that particular dispute is resolved, the ESI Protocol and all its provisions should apply to both parties, as "the law does not create different legal benchmarks for the parties in terms of their ESI disclosure duties." *Lawson v. Love's Travel Stops & Country Stores, Inc.*, No. 1:17-CV-1266, 2019 WL 5622453, at *4 (M.D. Pa. Oct. 31, 2019). Rather, "the legal principles governing [the parties'] reciprocal discovery obligations are fixed, firm, and ***absolutely symmetrical***," regardless whether one party is a corporate entity and the other party is a natural person. *Id.* (emphasis added). Plaintiffs' counsel recognized this uncontroversial and incontrovertible proposition during the meet-and-confer process, when they assured Defendant that the ESI Protocol would apply equally to both parties. The Court

12

should hold Plaintiffs to that representation and decline Plaintiffs' unsupported invitation to apply specific provisions to Defendant but not to Plaintiffs.

Plaintiffs argue they shouldn't have to abide by the search validation procedures they themselves propose because they have simple data and the scope of discovery is different. But Defendant is entitled to validate Plaintiffs' search efforts, simple data or not. *See Lawson*, 2019 WL 5622453, at *4. And although discovery *burdens* may be asymmetrical, discovery obligations are "absolutely symmetrical" and apply to both parties. *Id.* Plaintiffs' refusal to abide by their own validation procedures is especially galling given their representation elsewhere that "if search terms are used without proper testing and validation, they will *miss* 75-80% of relevant materials." That perceived problem would be particularly acute for Plaintiffs, given they are laypersons who self-collected their own documents. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, No. 3:16-MD-2734, 2017 WL 9249652, at *3 (N.D. Fla. Dec. 7, 2017) ("[S]elf collection by a layperson of information on an electronic device is highly problematic and raises a real risk that data could be destroyed or corrupted."). Put simply, the obligations of the ESI Protocol, including the search validation procedures, should be reciprocal.

Plaintiffs also raise vague privacy concerns to justify applying a different standard, but Defendant hasn't sought any private information from Plaintiffs (and they tellingly identify none). And to the extent a particular plaintiff has an actual

privacy concern, Plaintiffs are free to designate any information "Confidential" under the Protective Order. *See* ECF No. 121.

### 4. Email Threading (Ex. A, Section III ¶ 2; Ex. B. Section III ¶ 2)

- **Plaintiffs' position:**

The practice of suppressing production of all e-mails which are part of a thread – a chain of e-mails and responses – except for a so-called most inclusive e-mail which includes fragments of those e-mails, leads to the withholding of important information, dressed up as seemingly benign but entirely non-standardized technology. The included fragments omit and obscure substantive evidence visible in the suppressed originals. For example, attachment names plainly visible in the heading of a standalone e-mail get dropped by Outlook when the body of that e-mail is included in a thread going forward in a reply, leaving no evident trace of the attachment. E-mail thread suppression may also make it impossible to determine the critical substantive fact of what attachments were attached at each point in the thread.

Beyond the suppression of substantive evidence, e-mail thread suppression also disrupts, impedes, and prevents normal litigation preparation. First, the e-mail metadata fields that Plaintiffs' attorneys will use for searching do not include metadata of the suppressed e-mails. For example, only the person included in the FROM field will be the sender of the so-called most-inclusive e-mail. If Plaintiffs' attorneys search for all e-mails authored by a particular custodian, deponent or

witness, the search results will not include suppressed-in-thread e-mails where that custodian, deponent or witness is the sender unless, by serendipity, that custodian, deponent or witness also happened to be the sender on the so-called most inclusive e-mail.

Second, the e-mails suppressed by e-mail threading have independent significance in their original forms. For example, during depositions or cross-examination at trial, it may be critically important to confront a deponent or witness with an e-mail without disclosing what happened or was said afterward with respect to that e-mail, i.e., to be able to confront the deponent with a specific e-mail exchange as it existed by itself at a specific time before it was subsumed in a wider thread. This is impossible when e-mails are suppressed because they are not the so-called "most inclusive" e-mail.

Accordingly, if email thread suppression may be used, then there must be safeguards to ensure substantive information is not lost. Plaintiffs' ESI Protocol sets forth the basic ground rules for threading.[2] The tools available to Defendant can readily apply these safeguards to ensure threading is performed appropriately.

- **<u>Defendant's position:</u>**

---

[2] It does *not* address or fix loss of the ability to sort based on thread member metadata such as Date Sent, or to confront a witness with an in thread email as it looked at the time that it was sent, or difficulties in searching. To be clear, Plaintiffs' preference is that email threading not be used to suppress the production of relevant and responsive documents.

And in the paragraph addressing email threading, Plaintiffs again insist on including highly detailed and technical requirements in an ESI protocol when a simple, streamlined provision will do. Here, Plaintiffs propose a highly technical email threading procedure (*see* Ex. A, Section III ¶ 2), when Defendant's streamlined approach provides the same protections without the unnecessary complications (*see* Ex. B, Section III ¶ 2), to the extent email thread suppression is even used in this case.

### 5. Deduplication and Metadata (Ex. A, Section III ¶¶ 1, 11, Appx. A; Ex. B, Section III ¶¶ 1, 11)

- **Plaintiffs' position:**

Appendix A in Plaintiffs' Protocol identifies the necessary metadata fields that the Parties need to include in their document productions which are routinely part of a native file. Metadata is commonly described as "data about data," which is defined as information describing the history, tracking, or management of an electronic document. *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547 (D.Md. 2007). Defendant's proposal removes any obligation to produce substantial metadata fields that are already exist, including duplicate Custodians that possess responsive documents, Folder/File Path metadata for all withheld duplicates, metadata related to the application data source, metadata related to document attachments, metadata related to document modifications, and  metadata related to hidden content (such as hidden text, slides, notes, rows, worksheets, etc.). Defendant seeks to produce TIFF

16

images of their actual documents, thus hidden content could remain concealed unless disclosed as a metadata field. Even if documents are processed to reveal hidden content, the fact that a custodian hid certain data has independent significance. Folder/File Path metadata identifies where the files and e-mails are stored in the ordinary course of business. The metadata requested is typical, and is normally exchanged even in paper discovery, for example, by producing the cover of the manila folder in which documents are found. What Defendant seeks to do, essentially, is to empty their file cabinets and folders on the floor, and then produce documents, without any information regarding how or in what folders the documents were stored.

ESI items shall be processed in a manner that preserves the source native file and all metadata without modification, to the extent reasonably and technically possible. If Defendant is unwilling to produce this necessary and available metadata, then "production in native format will provide [Receiving Party] with the metadata necessary to identify the provenance of each document and put it into its proper context." *City of Colton v. Am. Promotional Events, Inc.*, 277 F.R.D. 578, 586 (C.D. Cal. 2011). Defendant purports that the manner in which is processes and produces documents loses metadata that would otherwise exist in native form. To be clear, the production of these metadata fields is widely accepted in federal court. The Court

should not permit Defendant to use outdated or inadequate tools to process and produce documents that removes substantive, relevant information.

Metadata, such as AllCustodians and Folder/File Path information, is a recognized way to authenticate electronic evidence. *Lorraine*, 241 F.R.D. at 547 (*citing* FED. R. EVID. 901(b)(4)). This type of metadata is critical if Defendant intends to deduplicate their documents. Marla R. Butler, *Electronically Stored Information: From Pre-Suit to Trial*, 12 Intell. Prop. & Tech. L.J. 3 (Dec. 2010) ("Custodian and file path information is similar to metadata, but instead of tracking changes to a document, it shows exactly where the document was located at the time that the proponent retrieved it....Both metadata and custodian/file path information are great tools."); William F. Hamilton, *How Best To Use The Electronic Evidence Consultant Be An Informed Consumer*, 36-WTR Fam. Advoc. 38, 39 (2014) ("The computer also tracks the file path, the file's computer location. The location of a memorandum in the 'This is Bad' e-mail folder can be as important as the e-mail's content").

- **Defendant's position:**

Defendant's ESI Protocol includes 26 metadata fields. (Ex. B, Section III ¶ 11). Plaintiffs insist on including many additional metadata fields, however, some of which are unnecessary given the provisions in the ESI Protocol to produce native documents (Ex. B, Section V), and several of which State Farm simply cannot

18

produce. Specifically, State Farm cannot produce metadata fields for the following fields, either because the field does not exist in State Farm's database or because the field is not populated as part of Defendant's collection and processing workflow:

- AllCustodians

- ALLFILEPATH

- APPLICATION

- ATTACHBATES

- E-mail Outlook Type

- FILEPATH

- HASHIDDENTEXT

- HASREVISIONS

- HASVERYHIDDENWORKSHEETS

- PARENTMSGID

- RedactionReason.

Relatedly, the parties also dispute a specific aspect of the deduplication provisions in Section III, Paragraph 1 of the ESI protocol—specifically, the provision of AlCustodian and AllFilePaths metadata fields that, as just explained, Defendant cannot provide. Defendant simply cannot produce certain metadata fields, so if the Court declines to adopt Defendant's proposed metadata fields, Defendant

requests that the ESI Protocol make clear that a party's obligations to produce metadata only extends to the extent that doing so is technically feasible.

* * *

WHEREFORE, the Parties respectfully request that the Court resolve the parties' disputes and enter an ESI Protocol.

Respectfully submitted,

SHAMIS & GENTILE, P.A.  AMUNDSEN DAVIS LLC

By: /s/ Andrew J. Shamis   By: /s/ Eric L. Robertson
 Andrew J. Shamis    Joseph P. Carlasare
14 NE 1st Avenue, Suite 705  150 N. Michigan Ave., Suite 3300
Miami, FL 33132    Chicago, IL 60601
Phone: (305) 479-2299   Phone: 312.894.3200
Emal: ashamis@shamisgentile.com Email: jcarlasare@amundsendavislaw.com

EDELSBERG LAW, P.A.   Peter W. Herzog III (pro hac vice)
Christopher Gold*    WHEELER TRIGG O'DONNELL LLP
Scott Edelsberg*     211 N. Broadway, Suite 2825
20900 NE 30th Ave., Suite 417  St. Louis, MO 63102
Aventura, FL 33180    Phone: 314.326.4129
Phone: (786) 289-9471   Email: pherzog@wtotrial.com
Email: chris@edelsberglaw.com
scott@edelsberglaw.com

SEEGER WEISS LLP    Eric L. Robertson (pro hac vice)
Christopher A. Seeger*   WHEELER TRIGG O'DONNELL LLP
Christopher L Ayers*    370 17th Street, Suite 4500
55 Challenger Road, 6th Fl.  Denver, CO 80202
Ridgefield Park, NJ 07660   Phone: 303.244.1842
Phone: (973) 639-9100   Email: robertson@wtotrial.com
Emai: cseeger@seegerweiss.com *Attorneys for Defendant State Farm Mutual*
cayers@seegerweiss.com   *Automobile Insurance Co.*

SEEGER WEISS LLP
Scott A. George
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Phone: (215) 564-2300
Email: sgeorge@seegerweiss.com

*Counsel for Plaintiffs and the
Proposed Class*