UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERNADETTE WILLIAMS, RICK MCCONNELL, IVAN SERRATA REYES, ROSILYN WILSON, LINDA LEWIS, LATASHA HUFF, HAUNANIMAE CERVANTES-WHITE, MARIA MUNOZ, TRACY OBRIEN, KIMBERLY BENSON, ROY TUINSTRA, EVELYN BROWN, MICHELLE SNYDER, PATRICIA COUCH, SABRINA CAPERS, WILLIAM ROSS DEAN, RICHARD DACHEFF, KRISTY KELLER, JASIMEN HERNANDEZ, EDGAR FLORIAN, MICHAEL GROSSBERG, MERRILL LOVE, DIANE NEWKIRK, SANDRA SMILING, DAVEY JOHNSTON, CYNTHIA ROEMER, SHAUN ROBERT, ROQUE ESPINOZA, JENNIFER PAYNE, LATISHIA BOWDEN, and DJ NEILL, TYSON DEWSNUP, and DEIRDRE PALMER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>Defendant. | Case No.: 1:22-cv-01422<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION TO COMPEL DISCOVERY RESPONSES</u>**

For years, Defendant State Farm Mutual Automobile Insurance Company ("Defendant" or "State Farm") fraudulently underpaid insureds who were owed the "Actual Cash Value" (also referred to as "ACV") of their totaled vehicles by applying a purported "typical negotiation

adjustment" (also referred to as "TNA") after it determined the value of those vehicles. *See* First Amended Class Action Complaint (ECF No. 58) ("FAC") ¶¶ 1-4, 49-54.

The "typical negotiation adjustment" was upwards of 11% of the value of the vehicle. State Farm never disclosed this fact to its insureds in its Policy or anywhere else, until after the fact. *Id.* ¶ 4, 53. After a total loss, Defendant provides insureds with "Market Valuation" documents regarding the value of the total loss vehicle, which include State Farm's first and only reference to the "typical negotiation adjustment," which is buried in a footnote. *See, e.g.*, ECF No. 58-3 at 78-87.

The "typical negotiation adjustment" was not based on any empirical data derived from actual negotiations. FAC ¶¶ 4, 53, 54. Rather, this downward "adjustment" was entirely arbitrary and unrelated to Defendant's policies with its insureds, including Plaintiffs, who paid their premiums expecting they would receive the full policy benefits they bargained for, but they were defrauded. FAC ¶¶ 4, 7, 54, 55, 57. Despite reasonable consumers' expectation, Defendant put its profits over its consumers' interests with its scheme to systematically undervalue insureds' vehicles without their knowledge or permission – all while charging them insurance premiums.

Through Defendant's deceptive, fraudulent, and unfair scheme, Defendant violated state consumer protection laws, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq*., breached its contracts and the covenant of good faith and fair dealing with its insureds, committed fraud, including fraud in the inducement, and was unjustly enriched.

Plaintiffs served State Farm with their First Requests for Production of Documents and First Interrogatories on August 23, 2023, which sought documents and information about Defendant's policies with insureds, its decision to begin using the TNA to reduce its payments to

2

insureds, its concealment of its use of TNA, and its eventual choice to change vendors and discontinue the use of a TNA when the first of several lawsuits like this one began being filed in 2020.[1] Defendant served its written responses on November 6, 2023. Attached hereto as Exhibits A and B are Defendant's Responses and Objections to Plaintiffs' First Requests for Production of Documents and First Interrogatories.

State Farm knew long before 2020 that its use of the TNA was illegal. Indeed, the TNA was merely a repackaging of State Farm's prior fraudulent scheme that ended in it paying out a class action settlement. At the end of 2006, State Farm resolved, on a class side basis, claims against it arising from its then use of a "Projected Sold Adjustment" in California in *Garner v. State Farm Mut. Ins. Co.*, CV-08-1365 (EMC) (N.D.Ca.). ECF No. 58-2. Like TNA, the Projected Sold Adjustment was "an adjustment to the asking price of comparable vehicles used in Total Loss Comparable Vehicle Valuation Reports . . . to reflect the price for which that comparable vehicle was projected to sell." *Id.* at ¶¶ 1.1, 2.28.

Accordingly, on November 21, 2023, Plaintiffs served their Second Requests for Production of Documents seeking discovery from the *Garner* action, as well as all non-privileged communications concerning the *Garner* action and discussions to continue its fraudulent practice under a different name. On December 21, 2023, Defendant served its responses. Attached hereto as Exhibit C is Defendant's Responses and Objections to Plaintiffs' Second Requests for Production of Documents.

In a blatant attempt to obscure the truth and shield itself from accountability, State Farm has employed a series of evasive tactics, refusing to comply with its discovery obligations and disclose critical evidence substantiating Plaintiffs' well-pled claims. Defendant has refused to

---

[1] The Court has referred to these litigations as the "Parallel Actions." ECF No. 83 at 7-11

produce discovery from any of the other litigations challenging Defendant's use of TNA, or any documents related to the *Garner* action and the repackaging of State Farm's "Projected Sold Adjustment."[2]

Defendant has refused to directly answer basic questions about when it first started using a TNA, or provide any information from the period before it began using Audatex, the vendor that provided State Farm the purported valuations for each of the Plaintiffs' totaled vehicles. Lastly, Defendant has refused to provide full information or documents to identify current and former employees, departments, divisions, committees, or teams likely to possess potentially relevant information ("Custodians") and their sources of potentially relevant information, including information about Defendant's creation and implementation of the TNA and its knowing use of the TNA to drive down its payments to insureds, while disclosing only a few "Claims Consultants" State Farm has unilaterally put forward as Custodians. Similar to its position on Custodians, to date, Defendant has produced little discovery beyond the "claims file" it maintains for each Plaintiff, while repeatedly misstating that this case is not "document-intensive" or "ESI-heavy." *See* ECF No. 139 at 5.

State Farm cannot shape discovery to suit its defenses and prevent disclosure of documents and information evincing State Farm's fraudulent practices. Plaintiffs are entitled to discovery concerning their claims and allegations. Accordingly, the Court should grant Plaintiffs' Motion and order Defendant to comply with its discovery obligations as set forth below.

---

[2] Given Defendant's use of Audatex as a false proxy for its use of TNA, the fact that "Projected Sold Adjustment" was used by Defendant via a different vendor, Mitchell, makes clear that the focus needs to be on what Defendant used as part of its determination of ACV and *not* what vendor it happens to use at any given time. *See* Argument 2, *infra*.

4

**RULE 37.2 STATEMENT**

Shortly after Defendant served its written responses to Plaintiffs' First Set of Requests for Production of Documents and Interrogatories, the parties began to meet and confer about Defendant's responses and objections. These discussions took place over the course of three months, and included emails from Plaintiffs setting out agendas with responses from Defendant (emails on November 20 and November 30, 2023, and January 11, 2024), followed by several in-person discussions (via Zoom on December 4 and December 18, 2023, and January 3, January 11 and January 27, 2024). While the parties were able to resolve some of the disputes, the parties reached *impasse* on the issues raised in this Motion.[3]

**LEGAL STANDARD**

The federal notice pleading system contemplates that parties will have broad discovery to investigate the facts and to help define and clarify the issues. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978); *United States v. Farley,* 11 F.3d 1385, 13 90 (7th Cir.1993). A party seeking discovery may file a motion to compel under Federal Rule of Civil Procedure 37 if another party fails to respond to a discovery request or when its response is insufficient. Fed. R. Civ. P. 37(a); *see also Belcastro v. United Airlines, Inc.*, 2019 WL 1651709, at *2 (N.D. Ill. 2019). "Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules." *United States Gypsum Co. v. Ectek Int'l, Inc.*, 2022 WL 1155155, at *2 (N.D. Ill. 2022) (citing *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D. Ill. 2018)). To that end, Rule 26(b)(1) provides in pertinent part:

---

[3] Plaintiffs expressly reserve the right to seek guidance from the Court on other disputes related to Defendant's discovery responses that may remain unresolved.

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

"Courts commonly look unfavorably upon significant restrictions placed upon the discovery process," and the "burden rests upon the objecting party to show why a particular discovery request is improper." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (citation omitted). Finally, when matters are referred to magistrate judges for discovery supervision, they have "extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013).

## ARGUMENT

**1. Defendant Should be Compelled to Immediately Produce Documents from Related Litigation**

Delay in discovery serves no end but delay. While Defendant has already gathered documents relevant to its current and standardized use of the TNA in what the Court has referred to as the "Parallel Actions," it has refused to simply hand over these productions to Plaintiffs. *See* First Request for Production No. 1 and Second Requests for Production Nos. 42 and 43. Production of these documents now would facilitate the current discussions between the parties about Custodians (already a matter in dispute, *infra*), ESI search terms, and otherwise facilitate effective and efficient discovery in this litigation. To be clear, these discovery materials have already been ***both reviewed*** by Defendant for both responsiveness and privilege ***and produced*** to plaintiffs in the "Parallel Actions." Reproduction of these unobjected-to materials here poses no burden on Defendant. Moreover, production does not require disclosure and negotiation of Custodians or any search methodology, *i.e.*, search terms.

It has been almost two years now since this case was filed, and State Farm still has not produced any substantive discovery (other than the "claims file" it maintains for each Plaintiff). Notably, Defendant's prior productions in the Parallel Actions have already supported at least one court's decision to certify a class of State Farm insureds challenging Defendant's use of the TNA in Tennessee. *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 220CV02482TLPCGC, 2023 WL 7213796 (W.D. Tenn. Aug. 25, 2023).

State Farm's intentional delay is significant here because, as this Court recognized, this case is broader than all the other similar actions pending against State Farm and, thus, it is likely the "'superior vehicle'" for resolving State Farm insureds' claims. ECF No. 83 at 25. Production of discovery from previous or concurrent litigation is proper where the cases have "significant factual and legal overlap, with both suits asserting claims under the same [ ] statute." *Schneider v. Chipotle Mexican Grill, Inc.*, 2017 WL 1101799, at *4 (N.D. Cal. March 24, 2017); *Rumble, Inc. v. Google LLC*, 2023 WL 3751797, at *7-8 (N.D. Cal. May 31, 2023) (granting plaintiff's motion to compel defendant to produce: (1) documents it produced to the DOJ and state Attorneys General because those investigations' allegations had "significant factual and legal overlap" with the allegations made by plaintiff in its antitrust claim and (2) documents produced to a congressional antitrust subcommittee because its "requests and the contents of the Congressional Report tracked similar allegations by plaintiff and [were] relevant to its antitrust claim"); *Costa v. Wright Med. Tech., Inc.*, 2019 WL 108884, at *1–2 (D. Mass. Jan. 4, 2019) (in products liability action, compelling production of cloned discovery from one other case which was "substantially similar because both involve claims stemming from fractures" of the same allegedly defective hip implant component); *Town of Westport v. Monsanto Co.*, 2015 WL 13685105, at *3 (D. Mass. Nov. 5, 2015) ("Materials produced and deposition testimony given in other litigation is generally

7

discoverable upon a showing of substantial similarity between the prior and current actions."); *see also In re Plastics Additives Antitrust Litigation*, 2004 WL 2743591, at *12-13 (E.D. Pa. Nov. 29, 2004) (noting "defendants in antitrust litigation regularly agree through joint discovery schedules to produce documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit" and citing "several cases in which defendants have been compelled to produce documents relating to government investigations."). These standards are met here.

The "Parallel Actions" are substantially similar to the instant litigation, with overlapping claims and allegations that closely intersect, varying only in the particular states where State Farm's scheme was carried out.[4] *See, e.g.*, ECF No. 83 at 7-11. The documents sought related to the *Garner* action are no different. It is the first time that State Farm was caught using an undisclosed adjustment to its valuation of total-loss vehicles purportedly to address marketplace negotiations, and any communications related to that action and assessment of the costs of discontinuing the use of that adjustment are squarely in line with Plaintiffs' claims here. Accordingly, any argument that Plaintiffs are seeking "cloned discovery" is misplaced. *Whitman v. State Farm Life Ins. Co.*, 2020 WL 5526684 *2 (W.D. Wash. Sept. 15, 2020) (ordering discovery from case with "the same defendant, the same policy form, the same claims, and the same alleged wrongful conduct alleged in the instant action").[5]

---

[4] To be sure, Plaintiffs are also asserting claims sounding in fraud, but this, along with the various states with insureds they seek to represent highlights why they also need to continue to pursue their own discovery above and beyond that already produced in the other "Parallel Actions." Indeed, this Court understood that the instant litigation "has the potential to be broader than the duplicative actions, which could render this a 'superior vehicle' for resolving insureds' claims." ECF No. 83 at 25 (citing *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 838 (7th Cir. 1999).

[5] Additionally, while the parties had a handful of disputes regarding the ESI Protocol they submitted to the Court, one of the agreed-upon provisions requires that "Documents or ESI known to be responsive to a discovery request or relevant to the subject matter of this action shall be

Accordingly, the Court should compel production in response to Requests Nos. 1, 42, and 43.

## 2. Defendant Should be Compelled to Produce Discovery and Responses to Frame Its Knowledge and Adoption of the TNA

The foundational fact of this litigation is Defendant's improper use of a TNA to reduce the purported ACV of insured vehicles. Accordingly, Plaintiffs sought basic information about where and when State Farm implemented and used TNA or any similar adjustment (Interrogatory No. 3), the methodologies State Farm used to determine ACV, and the time period for each (Request No. 25). With such information, Plaintiffs could frame when State Farm started using TNA, how that introduction changed State Farm's valuation methods, and show, in part, State Farm's knowing deployment of TNA as part of its efforts to deliberately reduce its payments to its insureds.

State Farm is evasive, and offers nothing in its responses to show, at a minimum, when it started using a TNA, or the methods preceding its adoption of TNA and after its eventual abandonment of TNA in the wake of this and the "Parallel Actions." For example, in response to Request No. 25 (documents concerning all methodologies), it refuses to produce any documents, but instead refers to its response to Interrogatory No. 2. State Farm's response to Interrogatory No. 2 (which seeks only where it used TNA and the time period it was used) provides no begin date for the use of a TNA, no end date for the use of a TNA, and information only about the general methods purportedly used by one of its vendors, Audatex, for some unspecified time period.[6]

---

produced . . . within thirty (30) days of entry of this Order." ECF No. 139-3 at II.2. While the order has not yet been entered, as an agreed to term, it will presumably be entered in due course.

[6] In its response to Interrogatory No. 2, State Farm incorporates per Rule 33(d) an "Autosource State Farm Job Aid" which has yet to be identified by State Farm in its document production, but which State Farm emailed informally to Plaintiffs pending such formal production and identification. They are marked confidential, and Plaintiffs will make these two documents available for *in camera* review if the Court would find them helpful.

To be sure, there are other Requests for Production that would provide some insight into State Farm's general practices, but State Farm has refused to produce any documents prior to its use of Audatex.[7] State Farm may want to use Audatex as a scapegoat for its own scheme, but Plaintiffs have a right to receive documents and information about *State Farm's* knowledge of its implementation and use of TNA and the methods it used to determine ACV before and after it deployed TNA.

Defendant should be compelled to provide full and complete responses to Interrogatory No. 2 and Request No. 25.

### 3. Defendant Should be Compelled to Cooperate in the Disclosure of All Potential Custodians And Data Sources Identified by Defendant as Likely to Possess Potentially Relevant Information.

Defendant intends to make custodial productions, including productions of custodial ESI, to be the primary, if not exclusive, source of documents responsive to several Requests.[8] However, Defendant has identified only two persons who acted, in succession, as Claims Consultants in charge of total losses. Defendant supplemented this disclosure with the identification of additional successor Claims Consultants during the parties' meetings and conferrals. However, State Farm's cooperation stopped there, and it has refused to provide organizational charts (Requests Nos. 33

---

[7] *See, e.g.*, Requests Nos. 7 (contracts with other vendors), 8 & 26 (templates for valuation reports), 10 & 12 (documents concerning the use of TNA), 14 (policies and practices regarding ACV), 15 (training materials), 16 & 17 (how TNA is calculated), and 27 (policies and procedures before using Audatex).

[8] *See, e.g.,* Request No. 12 (communications concerning TNA); *see also* Requests Nos. 6 (documents received from Audatex regarding its services), 8 (valuation report templates), 10 (use of TNA), 11 (discontinuation of use of TNA), 14, 16 & 17 (how TNA was calculated), and 25 (methodologies used to calculate ACV) which State Farm represented during the several discussions with Plaintiffs would be responded to by custodial searches and search terms. In addition, Plaintiffs are seeking not only policies, procedures, and training materials, but custodial documents related to the development of such materials. That is, the custodians need to cover each aspect of State Farm's operations surrounding total loss claims.

and 34), the identities of persons responsible for development of policies and procedures for the application of TNA (Interrogatory No. 5), and otherwise provide fundamental information (*see, e.g.*, Requests Nos. 40 and 41) to identify any potential Custodians.

Despite its obligations under Rules 16 and 26 and its agreement to Paragraph II.1. (Custodians and Sources) of the parties' ESI Protocol (*see* ECF No. 139-3),[9] Defendant has withheld information concerning those key Custodians possessing potentially relevant information, so that a proper roster of Custodians can be identified, and their documents collected and produced. State Farm also refused to agree to a limited Rule 30(b)(6) deposition on the topics of corporate structure and sources of ESI, insisting instead that Plaintiffs serve an omnibus Notice of Deposition pursuant to that Rule. Finally, as noted above, Defendant's refusal to provide discovery from the "Parallel Actions" blocks another route to identify potential Custodians.

Cooperation in a transparent discovery process is the path to reduce "gamesmanship" and ensure "forthright sharing of all Parties to a case with the aim of expediting case progress, minimizing burden and expense, and removing contentiousness as much as practicable." Sedona Conference Cooperation Proclamation, 10 Sedona Conf. J. 331, 332 (2009); *see also Moore v. Publicis Groupe*, 287 F.R.D. 182, 192 (S.D.N.Y. 2012) ("An important aspect of cooperation is transparency in the discovery process"); *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("[T]he best solution in the entire area of electronic discovery is cooperation among counsel."); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 261 (D. Md. 2008) (Cooperation can minimize costs "because if the method is approved,

---

[9]  While there were a handful of disputes regarding certain terms of the ESI Protocol that were submitted to the Court for resolution (ECF No. 139), this term was among the many that were mutually agreed to by the parties.

there will be no dispute regarding its sufficiency, and doing it right the first time is always cheaper than doing it over.") (emphasis added).

Rules 16 and 26 and Paragraph II.1 of the Parties' ESI Protocol specify a process for the Parties to exchange information about which individual custodians are likely to possess relevant information, what forms of ESI exist, in which non-custodial repositories (shared drives, databases, etc.) does it reside, and how it is stored. This information is supposed to be disclosed at the beginning of discovery. Addressing these questions at the beginning of the discovery process is consistent with Rules 16(b) and 26(a) and (f)—to avoid later disputes on what sources of responsive information exist, what sources are reasonably accessible, and what sources will be searched for responsive information. Early exchange of information is particularly important where, as here, there is a substantial imbalance of information between the Parties. Plaintiffs know what information they want, but have no real way to tell whether Defendant is conducting a reasonably robust search, or looking only where it suits them. Frontloading this exchange is designed to avoid later disputes—mid-production or mid-depositions—on what sources of information exist, are accessible, and what sources will be searched for responsive information. Identification of potential document sources, including employees, is a necessary first step to identifying custodians. *Baranco v. Ford Motor Co.*, No. 17-CV-03580-EMC, 2018 WL 9869540, at *1 (N.D. Cal. Apr. 10, 2018) (ordering the disclosure of the defendant's proposed search methodology, including the identity of its custodians, so that "[p]laintiffs have a reasonable opportunity to provide their input, objections, or suggestions as part of the meet-and-confer"). Defendant's continued delay and abrogation of its most basic discovery obligations is prejudicing Plaintiffs and their ability to prosecute their well-pled claims.

Accordingly, Defendant should be compelled to immediately provide all information available to it to identify potential Custodians and data sources, including responses to the relevant Requests for Production and Interrogatory and, if Plaintiffs so elect and notice, a designee to testify upon matters relevant to Defendant's organizational structure, including potential Custodians, and sources of ESI, without prejudice to Plaintiffs right later to notice additional depositions pursuant to Rule 30(b)(6).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion to Compel Discovery Responses should be granted.

| | |
|---|---|
| Dated: March 1, 2024 | Respectfully submitted,<br>**SHAMIS & GENTILE, P.A.**<br>*/s/ Andrew J. Shamis*<br>Andrew J. Shamis, Esq.<br>ashamis@shamisgentile.com<br>14 NE 1st Avenue, Suite 705<br>Miami, Florida 33132<br>Telephone: 305-479-2299<br><br>**EDELSBERG LAW, P.A.**<br>Scott Edelsberg*<br>scott@edelsberglaw.com<br>Christopher Gold*<br>chris@edelsberglaw.com<br>20900 NE 30th Ave., Suite 417<br>Aventura, FL 33180<br>Office: (786) 289-9471<br>Direct: (305) 975-3320<br><br>**SEEGER WEISS LLP**<br>Christopher A. Seeger*<br>Christopher L Ayers*<br>55 Challenger Road, 6th Fl.<br>Ridgefield Park, NJ 07660<br>Telephone: (973) 639-9100<br>Facsimile: (973) 639-8656<br>cseeger@seegerweiss.com<br>cayers@seegerweiss.com |

**SEEGER WEISS LLP**
Scott A. George
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Telephone: (215) 564-2300
Facsimile: (215) 851-8029
sgeorge@seegerweiss.com

*Counsel for Plaintiffs and the Proposed Class*

\* Admitted *pro hac vice*